**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

CARIN C.,                                          Case No. 1:24-cv-12878

       *Plaintiff,*                         Patricia T. Morris
                                                   United States Magistrate Judge
*v.*

COMMISSIONER OF SOCIAL
SECURITY,

       *Defendant.*

_____/

## MEMORANDUM OPINION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 13)

## I.    CONCLUSION

For the reasons set forth below, Plaintiff's motion for summary judgment (ECF No. 11) is **DENIED**, the Commissioner's motion for summary judgment (ECF No. 13) is **GRANTED**, and the decision of the administrative law judge (ALJ) is **AFFIRMED**.

## II.    ANALYSIS

### A.    Introduction and Procedural History

On March 8, 2021, Plaintiff filed an application for Supplemental Security Income, alleging she became disabled on January 1, 2019. (ECF No. 7-1, PageID.41). The Commissioner initially denied the application on October 6, 2021,

and on reconsideration on August 13, 2022. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held telephonically on November 14, 2023. (*Id.*). The ALJ issued a written decision on November 27, 2023, finding Plaintiff was not disabled. (*Id.* at PageID.41–50). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied her request on September 10, 2024. (*Id.* at PageID.24–27).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on October 31, 2024. (ECF No. 1). The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters." (ECF No. 9). The parties have since filed cross-motions for summary judgment for which briefing is complete. (ECF Nos. 11, 13, 14).

## B.    Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

Cir. 2007) (citation modified).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any.  If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.
>
> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work.  If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled.  If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled. (ECF No. 7-1, PageID.50). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since January 1, 2019, the alleged onset date. (*Id.* at PageID.43). At step two, the ALJ found the following severe impairments: degenerative disc disease of the lumbar, thoracic, and cervical spine

and paroxysmal dystonia.  (*Id.*).

At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing.  (*Id.* at PageID.45).  The ALJ found the medical evidence did not support listing-level severity for any physical impairment as no acceptable medical source had found an equivalent in severity to the criteria of any listed impairment.  (*Id.*).

Next, the ALJ found Plaintiff had the RFC

to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: the claimant can frequently climb ramps or stairs.  She must avoid concentrated exposure for extreme cold, to respiratory irritants, and to hazards.

(*Id.*).

At step four, the ALJ found Plaintiff was unable to perform any past relevant work.  (*Id.* at PageID.48).  However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform.  (*Id.* at PageID.48–49).  Specifically, the ALJ found Plaintiff could perform the requirements of a cashier II (330,000 jobs in the national economy), a fast food worker (785,000), and a mail clerk (35,000).  (*Id.* at PageID.49).  The ALJ thus concluded Plaintiff was "not disabled."  (*Id.*).

### E.   Administrative Record

Plaintiff raises two issues on appeal.  First, she argues the ALJ erred by failing to properly consider opinion evidence related to her physical impairments.  Second, Plaintiff argues the ALJ failed to properly consider her subjective allegations of

symptoms.  While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issues on appeal.

Plaintiff has a history of progressive neuropathic pain involving the neck and upper back with radiation down into the right arm.  (ECF No. 7-1, PageID.812).  She had an operation on her neck in August 2019 for spondylosis and stenosis C3–C7. (*Id.* at PageID.412, 819).  She has "disc protrusions at C5–C6 and C6–C7 result[ing] in mild-to-moderate and moderate central canal stenosis with no cord compression or abnormal cord signal intensity" and mild to moderate disc degeneration.  (*Id.* at PageID.701).  Her symptoms include a tremor, numbness, weakness, involuntary extremity movement, and muscle spasms in her right side.  (*Id.* at PageID.381).  She testified she has issues with the whole right side of her body, which cause her to fall and her hands to go numb.  (*Id.* at PageID.62).  She testified the issues make her unable to cook, lift, or carry anything and she spends about 60% of the time lying on her back in pain.[1]  (*Id.*).  She also testified that temperature changes cause her muscles to lock up.  (*Id.* at PageID.64–65).

At physical therapy in November 2019, Plaintiff reported having difficulty

---

[1] Throughout November 2019, Plaintiff reported pain between 4 and 8 out of 10.  (ECF No. 7-1, PageID.394–406).  In December 2019 and March, June, August, and October 2020, she noted it was between 4 and 7 out of 10.  (*Id.* at PageID.420, 426, 431, 433, 441). In July 2020, Plaintiff reported pain of 5/10, and then 6/10 in August.  (*Id.* at PageID.371, 380).  In June 2021, she reported pain of 4/10 with it sometimes reaching 9/10.  (*Id.* at PageID.716).  In August 2021, Plaintiff reported a 6/10.  (*Id.* at PageID.719).  At other times, medical records describe Plaintiff's pain as "mild."  (*Id.* at PageID.719, 726).

doing dishes and folding laundry.  (*Id.* at PageID.409).  She had high muscle tension. (*Id.* at PageID.394).  Range of motion testing in her shoulder revealed: flexion right up to 150 degrees (prior 175 degrees); flexion left up to 130 degrees (prior 165 degrees, 110 degrees); abduction right up to 170 degrees (prior 155 degrees); abduction left up to 140 degrees (prior 110 degrees); and abduction had muscle guarding.  (*Id.* at PageID.409).

The motor function in her upper extremities and lower extremities were all noted as 5/5 bilaterally in November and December 2019, and March and October 2020.[2]  (*Id.* at PageID.414–15, 417–18, 423–24, 442).  She was noted to be doing very well at reducing her opioid medication for pain, and had mostly discontinued its use by June 2020.  (*Id.* at PageID.420, 426, 431, 433).  In March 2020, Plaintiff was noted to be doing very well after Anterior Cervical Discectomy and Fusion surgery in her neck, with neck pain much improved and some numbness and weakness in her arms remaining.  (*Id.* at PageID.423).  In October 2020, she was noted to have "fairly significant benefit with activities of daily living as well as overall functionality with current medication regimen."  (*Id.* at PageID.438).

An MRI of Plaintiff's brain in August 2020 showed all results as normal.  (*Id.* at PageID.378).  An electroencephalogram also showed a normal result.  (*Id.* at

---

[2] On November 22, 2019, some assessments such as her lower trapezoid and rhomboids showed a 4-/5 or better.  (*Id.* at PageID.409).  But these were shown to be 5/5 again by November 26.  (*Id.* at PageID.414).

PageID.385).  However, Plaintiff reported her hands kept locking up and she would have to use the other hand to pry them open.  (*Id.* at PageID.372).  She was assessed as having a benign essential tremor.  (*Id.* at PageID.374–75).  Small fiber neuropathy was not completely ruled out at the time.  (*Id.*).

In June 2021, Plaintiff was using Tylenol as needed to treat her pain.  (*Id.* at PageID.716).  She reported walking two to three miles per day with her son.  (*Id.* at PageID.714).  In August and November, she described her pain as constant with a severity/intensity level of mild.  (*Id.* at PageID.719, 726).  Her doctor recommended a spine simulator to help manage the pain, which Plaintiff did not want to do.  (*Id.*).  Her muscle strength was 5/5 in all major muscle groups with a limited range of motion in her neck.  (*Id.* at PageID.722, 729; *see also id.* at PageID.735 (same for December)).  In November, Plaintiff was walking, stretching, and doing squats for exercise.  (*Id.* at PageID.727).

An MRI of Plaintiff's cervical spine in September 2021, showed anterior fusion at C6–C7 and disc bulging and central stenosis at that level.  (*Id.* at PageID.674, 679–80, 812).  She reported tremors in her hands and locking up of the muscles.  (*Id.* at PageID.674).  This was triggered by extreme changes in temperature and exertion and could cause her hands to "get stuck in flexed position where she had to manually pull them apart."  (*Id.*).  She was taken outside where the weather was hot and humid and within a few minutes had a muscle spasm.  (*Id.* at

PageID.676).  The spasm diminished several minutes after she went back inside to cooler temperatures.  (*Id.*).  The medical provider noted the symptoms were only apparent with temperature extremes and she was unable to tolerate extreme temperature changes.  (*Id.*).  Her strength was listed as a 5/5 in her upper and lower extremities with no atrophy and physiologic tone.  (*Id.* at PageID.676).

At a consultative exam in September 2021, performed by Dr. Angela Joseph, Plaintiff "appear[ed] slow and uncomfortable when moving."  (*Id.* at PageID.652). Her range of motion was within the normal range in all areas, but her motor strength was a 3/5 for her cervical spine (neck), a 4/5 for her lumbar spine (lower back), and 5/5 for all other areas.  (*Id.* at PageID.654–56).  Dr. Joseph concluded Plaintiff: had limitations in sitting or standing, having to change her position every 20 to 30 minutes; could walk for no more than 20 minutes; and could lift and carry less than five pounds occasionally but could not push or pull any weight over five pounds. (*Id.* at PageID.657).  The ALJ did not find Dr. Joseph's assessment persuasive.  (*Id.* at PageID.47).

In April 2022, Plaintiff was noted to appear comfortable, with no atrophy, and with physiologic tone and "5/5 strength in bilateral upper and lower extremities in proximal and distal muscle groups."  (*Id.* at PageID.790).  Her coordination was normal and accurate and Plaintiff was noted to "[a]rise independently; [with] normal posture; gait stable with normal stride length, rate, base and arm swing.  Heel, toe

tandem gait performed without difficulty." (*Id.* at PageID.791).

In July 2022, Plaintiff reported a reduced number and severity of spells since starting a new medication, with only a few "bad spells" where her right side locked up. (*Id.* at PageID.824). In December 2022, Plaintiff reported back pain when walking, sitting, or bending for a long time which improved with hot baths and stretching. (*Id.* at PageID.837). Her gait was noted as intact with normal station and posture and normal movements and strength in all extremities. (*Id.* at PageID.838).

In May 2023, Plaintiff reported pain throughout the day which increased to a 9/10 by the evening. (*Id.* at PageID.819). She reported intermittent tingling in her fingers but did not think there was weakness. (*Id.*). Her muscle strength and stretch reflexes showed 5/5 in all areas except her deltoid which showed a 4/5. (*Id.* at PageID.820). Her gait was stable with normal stride length and her coordination, amplitude, and speed in her fingers was normal. (*Id.*; *see also id.* at PageID.676, 825 (same for September 2021 and July 2022)). Further testing in 2023 showed a normal rheumatoid factor-serum. (*Id.* at PageID.864).

At an encounter with her provider in July 2023, Plaintiff reported longstanding symptoms in her right arm with grip and coordination and also reported she experiences pain, weakness, and tingling. (*Id.* at PageID.812). However, she reported no weakness, twitching, or cramps that day and also reported no difficulty with gait or walking, no falling, no arm pain or exertion, and no muscle aches or

weakness.  (*Id.*).   The provider's motor examination showed "normal upper extremity strength and normal distal lower extremity strength" with physiologic muscle bulk and tone.  (*Id.*).  Diagnostic findings showed normal latency, amplitude, and conduction in the right motor and sensory nerves with "normal findings in all muscle sampled in the right upper and right lower extremities."  (*Id.* at PageID.812–13, 815).  The provider concluded the tests were normal and "fail[ed] to demonstrate electrodiagnostic evidence of peripheral neuropathy, cervical, or lumbosacral radiculopathy, or myopathy."  (*Id.* at PageID.813).

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B).  The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources.  An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)     A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for

impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is

not a medical source." *Id.* § 404.1502(e).  "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a).  "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.*  The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability."  For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion.  In essence,

"[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

(i)     Length of the treatment relationship.  The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)    Frequency of examinations.  The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii)   Purpose of the treatment relationship.  The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)    Extent of the treatment relationship.  The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v)     Examining relationship.  A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive."  *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."  The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally

17

persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

>    (i)    Statements that [the claimant is] or [is] not disabled, blind, able
>           to work, or able to perform regular or continuing work;
>
>    (ii)   Statements about whether or not [the claimant has] a severe
>           impairment(s);

(iii)   Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

(iv)   Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

(v)   Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

(vi)   Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

(vii)   Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

(viii)   Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits."   *Id.*   The SSA will, however, "consider all

19

of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms."  *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)   Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a).  Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)   The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason

is very risky for [the claimant]; or

(5)     The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G.     Argument and Analysis

Plaintiff first argues the ALJ erred by failing to properly consider opinion evidence related to her physical impairments.   Second, Plaintiff argues the ALJ failed to properly consider her subjective allegations of symptoms.

### 1.     Opinion Evidence

Plaintiff argues the ALJ erred when he failed to properly consider the opinion of consultative examiner Dr. Joseph.  (ECF No. 11, PageID.898 (citing ECF No. 7-1, PageID.657)).  This argument is not persuasive.

Based on a physical examination, Dr. Joseph found Plaintiff could lift and carry five pounds occasionally and could not walk for more than 20 minutes at a time.  (ECF No. 7-1, PageID.657).  The ALJ found Dr. Joseph's assessment not persuasive as the limitations were not supported by "medical evidence relied upon, including the claimant's presentation with full motor strength and intact sensation during the clinical exam.  The limitations were also excessive and inconsistent with the medical evidence, including the claimant's presentation with negative cervical tenderness, negative straight leg raise testing, and full grip strength during treatment."  (*Id.* at PageID.47(citing *id.* at PageID.374, 417, 652, 716, 838)).

Plaintiff argues the ALJ's conclusion "'fails to provide an accurate and logical bridge between the evidence and the result on that significant issue, it is not supported by substantial evidence.'" (ECF No. 11, PageID.898 (quoting *Colleen A.R. v. Comm'r of Soc. Sec.*, No. 24-cv-10161, 2025 WL 338281, at *7 (E.D. Mich. Jan. 2, 2025))).

However, this is not a case where the ALJ wholly failed to discuss the supportability or consistency of a medical opinion like in *Colleen*. The ALJ here clearly discussed substantial medical evidence showing Plaintiff had full motor strength and function, including Dr. Joseph's own examination, which showed normal muscle tone and a normal grip strength in both hands and full motor strength in all areas except the spine. (ECF No. 7-1, PageID.374, 417, 653, 716, 838). Additionally, although Dr. Joseph noted Plaintiff had a slow gait, the ALJ cited to medical evidence in the record showing Plaintiff's gait was normal. (*Id.* at PageID.838). These findings are consistent with the record evidence reviewed by the Court.

"If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286. Dr. Joseph's opinion was inconsistent with both that physician's objective medical findings and others in the record. It was thus given less weight by the ALJ.

*See* 20 C.F.R. § 416.920c(c)(2).

This case is more like *Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *3 (6th Cir. Sept. 28, 2023), where the Sixth Circuit affirmed an ALJ's decision that discredited a medical opinion unsupported by office treatment notes and "largely unremarkable physical examinations, in which [the plaintiff] consistently displayed normal strength, reflexes, and gait." Here, Plaintiff's "largely unremarkable" physical examinations over a five-year period do not support the limitations Dr. Joseph opined. She was consistently noted to have full motor strength and function with normal gait (at least in her extremities). Plaintiff takes issue with the ALJ's discussion of "full motor strength" when Dr. Joseph's testing indicated motor strength of the cervical spine of 3/5. (ECF No. 11, PageID.899). However, taken in context, the ALJ's discussion was regarding her upper and lower extremities, which consistently exhibited full motor strength except for at one physical therapy session (which then improved back to full strength at the next therapy session days later). (*Id.* at PageID.409, 414). Much of Plaintiff's appeal focuses on these two findings in an otherwise unremarkable record that consistently showed full motor strength.

Plaintiff also argues the ALJ erred in assessing the opinion of state agency medical consultant Dr. Henderson. (ECF No. 11, PageID.899). Dr. Henderson limited Plaintiff's reaching in front, reaching overhead, and handling to "frequent"

and her fingering (fine manipulation) to "occasional." (ECF No. 7-1, PageID.89–91). Plaintiff argues this is inconsistent with record evidence that shows reduced muscle strength. (ECF No. 11, PageID.900–01 (citing (ECF No. 7-1, PageID.409, 654)). But again, this Court's job is not to re-weigh the evidence. Plaintiff cites to two spots in the record that show somewhat reduced muscle strength. But, as discussed above, Plaintiff's muscle strength returned to full shortly after the first test showing reduced muscle strength, and the second record cite concerns her neck muscles, and is thus unrelated to Plaintiff's ability to finely manipulate objects. The rest of the record evidence, as the ALJ discussed, shows full motor strength in the relevant areas. The ALJ's findings were thus supported by substantial evidence.

Additionally, the ALJ is not required to explain the basis for his assessment of medical opinions as to every conclusion:

> Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

*Adams*, 2023 WL 6366106, at *2 (quoting 20 C.F.R. § 404.1520c(b)(1)).

Ultimately, the ALJ properly considered the evidence and prior medical opinions and came to a conclusion supported by substantial evidence.

### 2.    Subjective Testimony

Plaintiff next argues the ALJ erred by cherry picking from the record in rejecting her subjective statements regarding the intensity and persistence of pain and the use of her hands.  (ECF No. 11, PageID.904).  Again she cites the two instances in the record showing reduced motor strength, discussed above.  (*Id.* at PageID.904–05).  Plaintiff also discusses record evidence showing that her hands sometimes get stuck in a position requiring her to pry them apart.  (*Id.* (citing ECF No. 7-1, PageID.674)).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility" as long as the assessment is supported by substantial evidence.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *see also Saunders v. Kijakzi*, No. 20-cv-12210, 2022 WL 885838, at *3 (E.D. Mich. Mar. 25, 2022) ("'It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant'" (quoting *Rogers.*, 486 F.3d at 247)).

Claims of cherry-picking record evidence rarely succeed: "the same process can be described more neutrally as weighing the evidence."  *White v. Comm'r of*

*Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009); *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (crediting argument of cherry picking requires court to re-weigh record evidence). Here, "[t]o be sure, there was evidence in the record from which a reasonable person could conclude that [Plaintiff] was disabled. But the relevant inquiry is whether substantial evidence supports the ALJ's decision." *Adams*, 2023 WL 6366106, at *4.

The only new issue Plaintiff raises is that her hands sometimes get stuck in a flexed position and she has to manually pull them apart. However, this does not compel a conclusion that the ALJ erred when he found that Plaintiff generally had full motor and grip strength and intact sensation despite "intermittent numbness in her hands and feet." (ECF No. 7-1, PageID.46). The ALJ noted he had considered Plaintiff's "wide range of reported activities from her testimony and function reports, the repeated reports of mild musculoskeletal pain, and her consistent presentation with normal musculoskeletal exam findings during treatment." (*Id.* at PageID.48). Additionally, medical evidence showed Plaintiff's hand spasms were "only apparent with temperature extremes," and the ALJ included a limitation to "avoid concentrated exposure to extreme cold" in her RFC. (*Id.* at PageID.45, 676).

In addition to the conflicting evidence discussed above, the ALJ discussed record evidence of Plaintiff's pain level, which included that she was able to treat her pain with Tylenol shortly after surgery, and Plaintiff's activities of daily living,

which included preparing food, socializing, and walking two to three miles a day. Plaintiff argues the ALJ "overly relie[s] on a selective reading of the record to support her conclusions." (ECF No. 14, PageID.936). But it is Plaintiff who overly relies on a selective reading of the record. Her allegations of error mainly depend on two findings in the entire medical record which are generally inconsistent with the rest of the record. Additionally, her recitation of facts heavily relies on her reported symptoms to medical professionals rather than their own objective findings. *Cf. Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 979–80 (6th Cir. 2011) (holding doctor's opinion based on plaintiff's subjective reports entitled to less weight than one based on objective medical findings). As such, Plaintiff has not shown the ALJ erred nor that the ALJ's decision is not supported by substantial evidence.

## III.   ORDER

For these reasons, Plaintiff's motion (ECF No. 11) is **DENIED**, the Commissioner's motion (ECF No. 13) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Date: December 29, 2025

S/PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge